**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: September 13, 2018.**

_____
**CRAIG A. GARGOTTA**
**UNITED STATES BANKRUPTCY JUDGE**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| | § | |
| IN RE: | § | CASE NO. 18-50085-CAG |
| | § | |
| FIRST RIVER ENERGY, LLC, | § | |
| | § | CHAPTER 11 |
| Debtor. | § | |

MEMORANDUM OPINION AND ORDER
GRANTING, IN PART AND DENYING, IN PART FIRST AND FINAL APPLICATION
OF ARMORY STRATEGIC PARTNERS, LLC FOR ALLOWANACE OF
COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF
EXPENSES INCURRED FROM JANUARY 13, 2018 THROUGH APRIL 7, 2018
(ECF NO. 531)

Came on to be considered the First and Final Application of Armory Strategic Partners,

LLC for Allowance of Compensation for Services Rendered and Reimbursement of Expenses

Incurred from January 13, 2018 through April 7, 2018 (ECF No. 531) (hereinafter "the Armory

Application"). Ageron Energy, LLC; American Shoreline, Inc.; Amexco, LLC; Aurora Resources

Corporation; AWP Operating Company; Benchmark Texas Petroleum, LLC; Bend Petroleum

Corp.; Crebb Oil Company; Crimson Energy Partners IV, LLC; Dewbre Petroleum Corporation; Diamond Energy Services LP; EnerQuest Oil & Gas, LLC; Firstrike Energy Corporation; Foundation Energy Management LLC; HRH Partners LTD dba Herschap Brothers; Jerry Dewbre, Trustee for the State of Texas; JLA Resources Company; Killam Oil Co. Ltd.; Lewis Petro Properties Inc.; Magnum Engineering Company; Magnum Operating LLC; Magnum Producing, LP; Mascot Oil Company; McDay Energy Corp.; Pearsall 10 Acquisitions LLC; PetroEdge Energy IV LLC; Progas Operating, Inc.; RLU Oil & Gas, Inc.; Rock Resources, Inc.; Sandel Operating Company; Seeker Oil Company, Inc.; Sellers Lease Service, Inc.; Sheldon Resources, LP; Teal Natural Resources, LLC; Texpata Pipeline Company; Texron Operating LLC; U.D. Man, Inc.; U.S. Energy Development Corporation; Viceroy Petroleum LP; Watson Energy Investments, Inc.; WCS Oil & Gas Corporation; and White Oak Resources VI, LLC, Creditors herein (collectively, "Producers") filed Producers' Objection to First and Final Application of Armory Strategic Partners, LLC for Allowance of Compensation for Services Rendered and Reimbursement of Expenses  Incurred from January 13, 2018 through April 7, 2018 (ECF No. 566) (the "Objection"). Applicant did not file a response.

Armory Strategic Partners, LLC and Scott Avila as Chief Restructuring Officer (hereinafter "Applicant" or "Armory") seeks from the bankruptcy estate allowance of compensation in the amount of $288,932.50 for professional services and reimbursement of expenses of $23,380.67[1] for a total award of $312,313.17 for the time period January 13, 2018 through April 7, 2018. Applicant also seeks authorization to apply on a final basis the pre-petition retainer of $60,000 to the unpaid balance and authorization for Debtor to pay Applicant the remaining balance of

---

[1] Originally, Applicant sought payment for expenses in the amount of $24,775.73. At the hearing, Applicant agreed to reduce his expense request by $1,395.06 for duplicate expenses.

$252,313.17. For the reasons stated herein, the Court finds that the Armory Application is granted, in part, and denied, in part.

JURISDICTION AND VENUE

The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1334. This matter is defined as a core proceeding under 28 U.S.C. § 157(b)(2)(A) (administration of the estate) and 28 U.S.C. § 157(b)(2)(B) (allowance or disallowance of claims against the estate). Venue is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicates for relief sought by the 11 U.S.C. §§ 363(b) and 330. [2]

BACKGROUND

First River was formed in 2014 to provide "midstream" transportation services to the oil industry across the southwestern United States and Great Plains. As a midstream service business, Debtor specialized in the purchasing and marketing of crude oil and condensate, along with all necessary multi-modal logistics throughout the journey from source to refinery. First River's services included buying and selling domestic crude oil and transporting oil through a combination of trucks or pipeline. Debtor generated substantially all its revenue through fee-based production agreements (the "Production Agreement"). In the case of a typical Production Agreement, Debtor utilized company trucking assets or contracted with a third-party carrier to deliver to a third party (the "Customer") an agreed-upon volume of oil. Debtor would purchase crude oil directly from an upstream producer at a lease and ship the oil via transporting by truck and/or pipeline.

On January 12, 2018, (the "Petition Date"), Debtor filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code in the Delaware Bankruptcy Court, initiating

---

[2] Unless otherwise indicated, all references are to 11 U.S.C. *et seq*. Applicant identified §§ 327, 328(a), 330(a), and 331 of the Bankruptcy Code as the statutory predicates for relief. Applicant's services were authorized under § 363(b) of the Code, subject to review by the Court under § 330. (ECF No. 200) (Retention Order).

Bankruptcy No. 18-10080. Also on January 12, 2018, two producers, U.S. Energy Development Corporation ("USED") and Viceroy Petroleum, LP. ("Viceroy") initiated a state court lawsuit against Debtor in the 408th Judicial District Court of Bexar County, Texas (the "State Court"), styled ***U.S. Energy Development Corporation and Viceroy Petroleum, LP., Plaintiffs v. First River Energy, LLC, Defendant***, Cause No. 2018-CI-00648 (the "Receivership Action"), claiming breach of contract and seeking the emergency appointment of a receiver over Debtor. The State Court then appointed Ray Battaglia as the receiver (the "Receiver") shortly after the filing of the lawsuit. On January 12, 2018, the Receiver filed a chapter 11 petition in this Court (Bankruptcy No. 18-50063). The State Court lawsuit was removed to this Court on January 12, 2018. (Adversary 18-05005) (ECF No. 1).

On January 19, 2018, various producers filed an Amended Motion to Appoint Chapter 11 Trustee in Bankruptcy No. 18-50063. (ECF No. 5) (the "Motion to Appoint Trustee"). Defendant/Debtor filed a Motion to Vacate Receivership (Adv. Proc. 18-05005, ECF No. 13) and a Motion to Dismiss Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1), (b)(2), (b)(5) and (b)(6) (Adv. Proc. 18-05005, ECF No. 12). On January 17, 2018, various producers[3] filed a motion to dismiss the Delaware bankruptcy case (ECF No. 31) ("Motion to Dismiss Case"). As a result of these filings, Debtor had two chapter 11 cases pending at the same time; one in Delaware and one in Texas. The Delaware Bankruptcy Court *sua sponte* transferred the Delaware bankruptcy case to this Court. (Bankr. Case No. 18-50085, ECF No. 40). As such, this Court would have had to decide which bankruptcy case would go forward.

---

[3] U.S. Energy Development Corporation, Viceroy Petroleum, L.P., Ageron Energy, LLC, Lewis Petro Properties, Inc., Crimson Energy Partners IV, LLC, PetroEdge Energy IV, LLC, Teal Operating, LLC, AWP Operating Company, RLU Operating, LLC., Killam Oil Co, Ltd., WCS Oil and Gas Corp. and Herschap Brothers

Debtor, Receiver, and the various producers reached a compromise and agreed *inter alia* that Adversary Proceeding No. 18-05005 would be dismissed; the Receiver would relinquish his role as the receiver for Debtor; and the Motion to Appoint Trustee and Motion to Dismiss Case would be withdrawn. Further, the Receiver supported Debtor's Motion to Dismiss Bankruptcy Case (Case No. 18-50063, ECF No. 20) and independently requested that the Court dismiss Bankruptcy Case No. 18-50063. On February 2, 2018, the Court dismissed Bankruptcy Case No. 18-50063 (ECF No. 30).

Once it was determined which case would go forward, Debtor's bankruptcy counsel, Akerman LLP ("Akerman") and other professionals (including Armory) assisted Debtor in obtaining cash collateral orders including a final order; preparing Schedules with approximately 20,000 creditors and the Statement of Financial Affairs; obtaining approval for a process to establish § 503(b)(9) claims; obtaining Court approval to pay Deutsche Bank Trust Company Americas as the Agent for the Lenders (the "Lenders") thereby eliminating approximately $130,000 per month in interest charges; obtaining approval to pay severance taxes (including the negotiation of a waiver of significant penalties and interest of approximately $322,000); and attending hearings and the Section 341 meeting. In addition, Debtor reduced its workforce to reduce employee compensation; completed the January reconciliation of December oil purchases and sales which resulted in collection of $26,700,000 in accounts receivable; rejected executory contracts; sold its rolling stock and various other assets; and in general wound up its business and liquidated its assets. Further, Debtor filed its Disclosure Statement for the Debtor's Plan of Liquidation under Chapter 11 of the United States Bankruptcy Code (the "Disclosure Statement") (ECF No. 319) and Plan of Liquidation under Chapter 11 of the United States Bankruptcy Code

(the "Plan"). (ECF No. 320).  The Court has not conducted a hearing on the Disclosure Statement or the Plan.

### A.     Scope of Retention

In the Application of Debtor Pursuant to Sections 105(a) and 303(b) of the Bankruptcy Code for Authorization to (A) Employ and Retain Armory Strategic Partners, LLC, to Serve as Financial Advisor for the Debtor and to Provide the Debtor a Chief Restructuring Officer, and (B) to Designate Scott Avila as the Chief Restructuring Officer for the Debtor Effective as of the Petition Date (ECF No. 126) (hereinafter, the "Retention Application"), Applicant identified the services to be rendered as follows:

- Assist the Debtor and its counsel with general matters related to the filing of the Chapter 11 Case;
- Provide restructuring advice throughout the Chapter 11 Case;
- Review of financial information pertaining to the Debtor's assets, liabilities, cash flows, financial statements, and projections;
- Assist the Debtor in cash management and cash flow forecasting processes, including the monitoring of actual cash flow versus projections;
- Assess and determine, in conjunction with counsel and the Debtor, vendors with a payment priority, and communication strategy;
- Work with the Debtor, and its other professionals, to complete the schedules and the Statement of Financial Affairs, any amendments necessary, and the Monthly Operating Reports required by the Office of the United States Trustee;
- Assist the Debtor and counsel with preparation for hearings, testimony, creditors meetings, and creation of supporting exhibits and motions needed during pendency of the Case;
- Work with the Debtor and counsel to develop the appropriate plan and disclosure statement documents, including a liquidation analysis and estimation of creditor recoveries;
- Assist the Debtor and counsel with litigation support and forensic analysis, where appropriate;
- Review financial information exchanged between the Debtor and its creditors, any regulatory agencies,

> consultants, prospective investors or other third parties, as may be necessary or appropriate;
>
> - Assist the Debtor in connection with the Debtor's communications and negotiations with other parties, including its lenders and significant vendors;
> - The CRO shall be responsible for managing the "working group" of professionals who are assisting the Debtor in the reorganization process to improve coordination of its effort and work product to be consistent with the Debtor's overall restructuring goals; and
> - The CRO and Armory shall perform such other services as may be agreed upon between the parties.
>
> The services to be provided by Armory and Avila will not be duplicative of those provided by any other advisors to the Debtor, and Armory and Avila will coordinate any services performed at the Debtor's request to avoid duplication of effort.

(ECF No. 126). Moreover, the resultant Retention Order limits Applicant's scope of services such that Applicant "[s]hall not act in any other capacity, for example, and without limitation, as a financial advisor, claims agent/claims administrator, or acquirer)." (ECF No. 200). The Retention Order does not define "financial advisor." Moreover, to the Court's knowledge, the Parties have not agreed to any other services outside the scope of services identified within the Retention Order.

## B.       Fee Cap

On February 16, 2018, the Court held a hearing regarding the Retention Application. At the hearing, parties-in-interest expressed concern over the cost of retaining Applicant and to alleviate such concerns, Applicant volunteered to limit his fees at an amount not-to-exceed $100,000. (Transcript, Feb. 16, 2018, 114: 1–8). On March 24, 2018, Debtor filed an Expedited Motion for Clarification Relating to Order Approving Employment of Armory Strategic Partners, LLC seeking clarification from the Court "on the timeframe of the 'cap' on [Applicant's] fees and expense and the ability of [Applicant] to seek Court approval of additional fees and costs in this Case" (hereinafter, the "Motion to Clarify") (ECF No. 367). Moreover, Applicant asked the Court

to (1) "clarify that the 'cap' be relevant only to the period up to and including March 15, 2018, and that cap for said period be enlarged to $125,000"; and (2) clarify whether the Applicant "may seek approval for additional fees and costs incurred in the Case after March 15, 2018." *Id.* On April 5, 2018, the Court heard Debtor's Motion to Clarify and on April 9, 2018, entered an Order Denying the Motion to Clarify (ECF No. 456). During the hearing, however, the United States Trustee informed the Court that "there was an agreement between the Parties . . . that Armory would be entitled to the fees between [the week of March 26, 2018] and [the week of April 2, 2018] because there was some question about how the Court would rule" on allowing Applicant to incur fees exceeding the $100,000 cap. (Transcript Audio, Apr. 5, 2018, 2:25:16–36). Accordingly, the $100,000 not-to-exceed amount applies only to the period of February 17, 2018 to March 26, 2018.

### EVIDENCE AT HEARING IN APPLICANT FEE APPLICATION

Scott Avila – Scott Avila ("Avila") is a Senior Managing Partner with Armory. He and his company were hired by Debtor pre-petition (mid-October 2017) to advise the company in its distressed state and was later hired post-petition as CRO. Avila has served in this capacity since the late 1980s to early 1990s and has served as CRO approximately twenty-five times. Avila explained that his role as a financial advisor generally involved providing restructuring advice, operational advice, and capital advice in challenged-distressed companies. Avila distinguished these duties from those of a financial adviser involved in investment banking and raising and selling capital. Avila further specified that his duties typically include making operational improvements, restructuring the balance sheet, guiding a company through downsizing, or guiding a company through a formal chapter 11 case.

Avila testified that when Armory is hired as a financial advisor, other professionals at Armory assist him as a financial advisor and that individuals are assigned based on a variety of

factors including experience, rate, and the present circumstances. Avila clarified that when retained as a CRO, the level of support staff may increase because the accountabilities of a CRO are greater. Avila testified that at the time of filing, Debtor significantly reduced the work force primarily made up of administrative and clerical staff used to process settlements. Avilia also testified that outside of the employees picking up trucks, on the petition date, Debtor employed approximately 15–20 employees, and that the week after Debtor filed bankruptcy, this number dramatically decreased to approximately four individuals. According to Avila, Debtor did not have adequate in-house staff to accomplish the demands placed on Debtor after filing its chapter 11 case.

Avila also testified as to the tasks and duties performed in each of the categories objected to by Producers. In summary form, Avila testified that the tasks he and his team performed were necessary and reasonable given the results obtained and/or the tasks necessary to accomplish the goals of the case.

With respect to his appearance at hearings, Avila testified that before every hearing, he consulted with Akerman as to whether he should attend the hearing, and based on Counsel's response, he would or would not attend. He also testified that Akerman asked him to attend every hearing in this case.

Avila testified that many of the functions he performed here could not have been performed by Debra Kryak because her time was wholly consumed working on other matters. He testified that he observed Debra Kryak working up to ninety hours a week, spending her time working on the settlement, pulling the assets together, locating trucks, and cleaning up operational issues. He testified that she also served as a source of knowledge for gathering information. Avila also

testified that Debra Kryak did not have the requisite bankruptcy experience to handle the functions performed by the CRO.

Avila testified that there was no overlap with Armory's work and Akerman's work. Avila explained the two entities worked "hand-in-hand" and that when Akerman needed information, Applicant provided such information. Applicant also provided Akerman with observations based on its past experience. Applicant described their relationship as a "good partnership" which effectuated the goal of the case in an efficient manner.

Debra Kryak – Debra Kryak ("Kryak") has served as Debtor's CEO since April 2016. Kryak testified as to her extensive experience in the oil and gas industry. She is currently Debtor's only employee. As Debtor's CEO, she has streamlined operations, including eliminating ticketing for purchases of crude oil and condensate and serving also as the accounts payable manager. Kryak explained that she additionally serves as CFO of Debtor while Avila serves as the CRO. Kryak described Avila, in the capacity of CRO, as Debtor's second officer responsible for financial and income analysis and assisting in the preparation of financial information for Debtor's bankruptcy case. Further, Kryak explained that Avila's services were necessary because, given the limited number of employees when Debtor filed bankruptcy, neither she nor anyone on her staff could provide the financial reporting that a chapter 11 bankruptcy case requires. Moreover, Kryak stated that she relied on Akerman for legal counsel and Avila for financial assistance. In summary form, Kryak stated that she believed that Armory and Akerman's fees are reasonable and necessary.

Kryak was pressed to explain why she received a retention bonus equal to her annual salary of $264,000.00 plus her annual salary as a condition of remaining Debtor's CEO and CFO. Kryak stated that she did not make her retention as Debtor's CEO and CFO conditioned on receiving any additional compensation. She further stated that one other employee of Debtor was paid a retention

bonus of $141,000 to finish the claims process with one of Debtor's purchasers.[4] Kryak stated that she did not recall any discussion that Debtor's board considered converting the case to chapter 7 after all Debtor's accounts receivables were liquidated. Kryak acknowledged that once Debtor filed chapter 11, there was no chance Debtor could operate as a going concern. Further, in reviewing some of Armory's financial analysis prior to filing chapter 11, she was aware that a liquidating chapter 11 plan would most likely not be able to pay all of Producers' claims if the Producers' lien was determined to have first priority.

David Parham – David Parham ("Parham") testified as lead counsel in Debtor's chapter 11 case. Parham, along with John Mitchell, are lead counsel to Debtor and partners at Akerman. Parham has over twenty years of bankruptcy experience and has handled a number of large bankruptcy cases in San Antonio. Parham explained that Debtor's board elected to file bankruptcy in Delaware. Further, the board believed that filing in Delaware could maximize value for creditors. Parham noted that the bankruptcy case in Delaware remained there for a short period of time.

Parham stated that there was no duplication of services with Armory. He explained that it is customary for bankruptcy counsel to confer with other professionals of the estate. Moreover, Akerman relied on Armory to prepare the financial data necessary to prepare a number of pleadings for filing in bankruptcy court. Parham disagreed that the bankruptcy filing in Delaware was not reasonable and necessary, noting that it was Debtor who elected to file in Delaware, not its bankruptcy counsel. Moreover, the board did not want to give control of the bankruptcy case to the Receiver. Parham acknowledged that the Delaware filing was done with the Lender's consent

---

[4] The Producers, United States Trustee, and the Court were not aware of the payments to Debtor's insiders on the petition date or that other employees had been paid bonuses to continue to work for Debtor.

to facilitate an agreement on the use of cash collateral.[5] He noted that the board did not want to convert the case to chapter 7. Parham stated that a chapter 7 trustee could not have made the recoveries that this chapter 11 Debtor had.

Parham explained that the fees associated with the preparation of Debtor's Disclosure Statement and Plan (roughly $109,000) are reasonable given that they were filed within two months of the petition date and that those services included multiple term sheets and drafts, plus the consideration of the treatment and payment of § 503(b)(9) administrative claims. Moreover, in Parham's judgment, Akerman's overall services have been successful given the short timeline of the case and that Akerman was able to negotiate savings on the Lender group's interest accrual on the debt and reduction of payment of tax to the State of Texas.

### LEGAL STANDARD[6]

Pursuant to § 330(a)(1), a professional employed by a debtor-in-possession may be awarded: (a) reasonable compensation for actual and necessary services performed by the professional; and (b) reimbursement for actual, necessary expenses. The court may, on its own motion or the motion of the trustee, award compensation that is less than the amount of compensation requested. 11 U.S.C.A § 330(a)(2) (West 2018). The statute further precludes courts from awarding compensation for "unnecessary duplication of services; or services that were not reasonably likely to benefit the debtor's estate; or necessary to the administration of the case." *Id.* § 330(a)(4)(A).

---

[5] The Producers argue that the real purpose in filing in Delaware was to take advantage of the Third Circuit's decision in ***Arrow Oil & Gas, Inc. v. J. Aron & Co. (In re SemCrude L.P.)***, 864 F.3d 280 (3d Cir. 2017), where in a similar dispute between a lender and producer, the lender prevailed on a priority of lien dispute.

[6] The discussion of § 330 and the Fifth Circuit's analysis of fee awards in chapter 11 cases is reproduced from the Court's opinion in ***In re Palmaz Scientific, Inc.***, 556 B.R. 770, 783–85 (Bankr. W.D. Tex. 2016).

In accordance with Fifth Circuit case law, bankruptcy courts employ the lodestar method to calculate reasonable fees under § 330(a). *In re Cahill*, 428 F.3d 536, 539–40 (5th Cir. 2005). The lodestar is computed by multiplying the number of hours a professional would reasonably spend for the same type of work by the prevailing hourly rate in the community. *Id*. at 540. The court then considers whether the lodestar figure should be adjusted upward or downward depending on the circumstances of the case, looking specifically to the *Johnson* factors. *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). The *Johnson* factors include the following: (1) time and labor required; (2) novelty and difficulty of the legal questions; (3) skill required to properly perform the legal services; (4) preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the clients or the circumstances; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *In re MSB Energy, Inc.*, 450 B.R. 659, 662 n.7 (Bankr. S.D. Tex. 2011) (citing *Johnson*, 488 F.2d at 717–19).

In its en banc decision in *Barron & Newburger, P.C., v. Tex. Skyline (In re Woerner)*, 783 F.3d 266 (5th Cir. 2015), the Fifth Circuit Court of Appeals analyzed the statutory framework of chapter 11 cases regarding the retention of professionals for a debtor. In doing so, the court recognized that a chapter 11 debtor may retain counsel and hire professionals for the estate. *Id.* at 271. The court observed that Congress enacted a uniform scheme for retaining and hiring professionals and attorneys under §§ 327–330. *Id*. at 271–72. Under § 330(a)(1)(A), an attorney whose employment was approved under § 327 may request "reasonable compensation for actual, necessary services rendered." *Id*. Moreover, the bankruptcy court may use its discretion in

awarding compensation less than the amount requested. *Id*. Section 330(a)(3) directs courts to "consider the nature, the extent, and the value of the legal services provided when determining the amount of the reasonable compensation to award, taking into consideration a number of factors listed in § 330(a)(3)." *Id*. Further, under § 330(a)(4), a court may not allow compensation for "services … not reasonably likely to benefit the debtor's estate. . . ." 11 U.S.C § 330(a)(4)(A)(ii)(I).

The Fifth Circuit explained that § 330 "states twice, in both positive and negative terms, that professional services are compensable only if they are likely to benefit the debtor's estate or are necessary to case administration." *Id.* at 273. Stated differently, a court may approve compensation of an attorney for services that are "reasonably likely to benefit" the estate and determine the reasonableness "at the time in which the service was rendered." *Id.* The court also recognized that litigation is a gamble and that § 330 permits a court to compensate an attorney not only for services that were necessary, but also for good gambles for services that were objectively reasonable at the time they were performed. *Id.* at 274. As such, the court concluded that the "actual benefit" test should be replaced by a prospective standard, following the holdings in the Second, Third, and Ninth Circuits.[7]

## ANALYSIS

In reaching its decision, the Court notes that it has carefully reviewed the admitted evidence and weighed the credibility of each witness. The Court has also examined its docket in these cases and all relevant pleadings in connection with its consideration of the Armory Application. Nothwithstanding the objecting Parties' complaints about the amount of Armory's fees, no Party

---

[7] *In re Ames Dept. Stores, Inc.*, 76 F.3d 66, 71 (2d Cir.1996); *abrogated by Lamie v. U.S. Trustee*, 540 U.S. 526 (2003) (finding that a fee award should be contingent on reasonably likely to benefit the estate standard); *In re Top Grade Sausage, Inc.*, 227 F.3d 123, 131-32 (3d Cir. 2000) (rejecting a standard under § 330 that required a hindsight evaluation); *In re Smith*, 317 F.3d 918, 926-27 (9th Cir. 2002) (§ 330(a)(4)(A) requires a prospective approach in fee awards).

complained about the experience and competency of Armory. As such, the Court will not reduce Armory's fees on the basis of those factors.

### A. Use of Cash Collateral

The Producers object to Debtor's use of any cash collateral to pay Armory's fees and expenses pursuant to Interim Order Authorizing the Debtor to Use Cash Collateral Under 11 U.S.C. §§ 105 and 353 (ECF No. 102) (the "First Interim Order"), Second Interim Order Authorizing the Debtor to Use Cash Collateral Under 11 U.S.C. §§ 105 and 353 (ECF No. 134) (the "Second Interim Order"), and Final Interim Order Authorizing the Debtor to Use Cash Collateral Under 11 U.S.C. §§ 105 and 353 (ECF No. 260) (the "Final Order") (collectively, the "Cash Collateral Orders"). The Cash Collateral Orders each conditioned Debtor's authorization to use cash collateral on the requirement that all use of cash by Debtor shall be deemed to be made first from any cash that is not [c]ash [c]ollateral and thereafter from the [c]ash [c]ollateral." ECF Nos. 102, 134, and 260. The Court agrees. Therefore, to the extent that any of Debtor's cash is cash collateral, Debtor must pay Applicant first using cash that is not cash collateral.

### B. Scope of Services and Duplication of Efforts

Producers contend that fees related to Case Administration, Claims, Creditor Interaction, Disclosure Statement/Plan, First Day Motions, Litigation, Schedules/SOFA, and U.S. Trustee Reporting "should have been performed by the Debtor's bankruptcy counsel and are outside of [Applicant's] authorized capacity pursuant to the Retention Order." Moreover, Producers allege that these services may be duplicative of the services rendered by Debtor's bankruptcy counsel, but because Counsel to Debtor's application for fees was filed one day prior to the deadline to respond to the Armory Application, Producers did not have sufficient time to determine whether such services were duplicative.

The Court has independently reviewed the related time records and finds that the tasks performed under these categories are consistent with the scope of work authorized under the Retention Order. The Court notes that Applicant's approved scope of work is broad. For example, the Retention Application states that Armory's functions will include "[a]ssisting the Debtor and its counsel with general matters related to the filing of the Chapter 11 Case[.]" ECF No. 126. The essence of Producers' objection is that the work performed by Applicant *should* have been performed by bankruptcy counsel. This type of objection is not appropriate at the fee application stage. Applicant's scope of work was expressly stated in the Retention Application (ECF No. 126). If Producers felt that this scope of work was not appropriate for a CRO, Producers should have objected on this basis at the retention stage, not at the fee application stage. As such, the Court finds that Producer's Objection on this basis is without merit.

Moreover, the Court has independently reviewed the relevant time entries for both Armory as well as Akerman and has not identified time entries where both Armory and Akerman were performing duplicative services. Both Avila and Akerman testified that there was no duplication of services. Their testimony revealed that Akerman relied on Armory to prepare the financial data necessary to prepare a number of pleadings for filing in bankruptcy court and conferred with Armory on various matters. Additionally, Kryak testified that she relied on Akerman and Armory to perform two separate functions; mainly, she relied on Akerman for legal counsel and Avila for financial assistance. In summary, it appears that Applicant and Debtor's bankruptcy counsel worked on these tasks as a team and coordinated their efforts to avoid duplication of efforts.

### C. Cash Flow Projections

Producers object to all fees related to Cash Flow Projections. Specifically, Producers argue that the Armory Application does not adequately explain why Applicant spent 53.1 hours doing

cash flow projections for Debtor who has no operations. The Court has independently reviewed the relevant time entries related to Cash Flow Projections and finds that the time entries are consistent with Applicant's description of its tasks related to Cash Flow Projections. In its review, the Court did not identify time entries which related to cash flow projections in the context of a going concern; rather, the time entries reflect tasks performed for purposes of preparing and revising budgets, projections, and reports for purposes of the Cash Collateral Orders.

### D.  Cash Management

Producers object to all fees related to Cash Management asserting that such services from Applicant were unnecessary and to the detriment of Debtor's estate. Producers allege that Applicant failed to explain why Debtor was unable to open post-petition bank accounts—a standard requirement in chapter 11 cases—without Applicant's assistance, and that such action should have been easily accomplished by Kryak without the need to incur fees. Moreover, Producers argue that Applicant failed to explain why Applicant was needed to advise Debtor's counsel as to the financial status and progress of Debtor's business as such information could have been easily conveyed by Kryak.

During the hearing, Kryak explained that Avila serves as Debtor's second officer. The collective testimony also revealed that Armory executed functions in a financial capacity that Kryak did not have the time and/or experience to perform. Considering Armory's authorized scope of work, and given that Armory was retained to provide financial services to Debtor in the capacity of a second officer of Debtor, the Court does not find services related to opening post-petition bank accounts and advising Debtor's counsel as to the financial status and progress of Debtor's business unreasonable.

### E. Fees Related to Providing "Financial Advice"

Producers also object to payment of fees related to Applicant providing "financial advice" as the Retention Order specifically precludes Applicant from performing as a "financial advisor." The Retention Order precludes Applicant from acting as a financial advisor, but does not define "financial advisor." At the hearing, Avila clarified that Armory's role as a financial advisor was to provide restructuring advice, operational advice, and capital advice in challenged-distressed companies. Avila also distinguished that role from one of a financial advisor who involved in investment banking and raising and selling capital. Avila's alternative characterization of a financial advisor is consistent with the Applicant's approved scope of work as approved by the Retention Order. Moreover, without further clarification as to the definition of "financial advisor" for purposes of the Retention Order, the Court cannot find that Applicant's services related to providing financial advice runs counter to the Retention Order's proscription from acting in the capacity of a financial advisor.

### F. Claims

Producers object to payment of all fees related to Claims asserting that Debtor should not be concerned with claims other than the allowance and payment of administrative expenses given that the inevitable outcome of this case is a liquidation. Applicant describes its tasks related to Debtor's claims pool of over 20,000 claims as analysis required for Debtor to determine proper treatment of claims in this case and the proposed plan of liquidation. The Court agrees that this is a liquidating case. The primary issue in this case, which will be resolved through an adversary proceeding (Adv. Proc. No. 18-05015), is whether Producers' asserted liens have priority over the Lender's asserted liens. The outcome of that dispute will ultimately determine which claims will be paid and which will not. For example, if the Lenders prevail, it is conceivable that claims other

than administrative expenses will be paid. Because the dispute has not been resolved, as part of its Disclosure Statement and Plan Debtor is required to perform a liquidation analysis indicating which claims will be paid under either scenario. Therefore, the Court does not agree that consideration of the entire claim pool is inappropriate.

### G. Monthly Operating Reports

Producers object to the payment of all fees related to Monthly Operating Reports. Producers contend that the Application does not explain why Avila and others at Armory spent 14.4 hours to perform these tasks which produced only two Monthly Operating Reports (ECF Nos. 246 and 340). The Court has independently reviewed the related time records and the Monthly Operating Reports that were filed as a result. The Court does not find that fees related to Monthly Operating Reports are unnecessary or unreasonable.

### H. Preparation for Fee Applications

The Producers object to payment of all fees related to Preparation for Fee Applications arguing that the fees are excessive and unnecessary. Armory seeks payment of $12,498.50 for such fees. This Court has previously held that a metric for fee application preparation fees should be in the range of 3–5% of the fees requested. *See* ***In re Palmaz Scientific, Inc.***, 556 B.R. at 787; *see also* ***In re Mesa Air Group***, 449 B.R. 441, 445 (Bankr. S.D.N.Y. 2011) (finding that a 3–5% cap on fee preparation fees is a useful metric in determining the reasonableness of the fees and benefit to the estate). In total, Applicant seeks $288,932.50 in fees. Applicant's fees for fee application preparation is approximately 4% of the total requested fees. Accordingly, the Court sees no basis for reducing Applicant's fees for fee application preparation.

## I. Avila's Appearance at Hearings

Producers object to all fees related to Avila's appearances at hearings in this case arguing that given that this was a liquidating case, and Kryak was here in San Antonio, Avila's appearance and travel were unnecessary and unreasonable. Producers also argue that to the extent that Avila's presence was unnecessary at hearings, such expenses should also not be paid.

As to Avila's appearance at the hearings, Avila testified that he attended every hearing because Debtor's bankruptcy counsel asked him to attend every hearing. The Court must accord a certain amount of deference to Debtor's bankruptcy counsel when it comes to decisions regarding the bankruptcy case, and here, the Court must extend such deference to this decision. Accordingly, the Court will not reduce fees nor expenses related to Avila's appearance at hearings.

## J. "Other" Expenses

Producers object to expenses in the amount of $183.99 related to the category of "Other" because the Producers have no way of determining what this expense is for and if it was necessary and reasonable as Armory has not provided any explanation for this expense. The March 2018 expense records indicate that this expense was for the purchase of a "Computer Monitor for auction."[8] The Court does not find that such an expense is unnecessary or unreasonable.

## K. Delaware and Receivership Fees and Expenses

No Party objected to Applicant's fees and expenses as it relates to the Delaware filing and the Receivership. The Court, however, takes objection to such fees and expenses. Based on the testimony elicited at the hearing on the Application and Akerman's fee application, it was

---

[8] The Court also notes that the March expense records show an additional line item for a "Computer Monitor for auction" on March 25, 2018 for the same price under "Supplies." As previously noted, Applicant and the U.S. Trustee agreed to reduce duplicative expenses at the hearing on the Application. The Parties did not state which expenses they deemed to be duplicative of each other. As such, the Court cannot ascertain whether or not this expense was considered a duplicative expense considered in the agreement between Applicant and the U.S. Trustee.

abundantly clear to the Court that filing the case in Delaware was done to preserve Debtor's board control of the case and to have a forum where the issue of the *SemCrude* decision could be litigated. The facts of the case are the same whether filed in Delaware or Texas: Debtor does not have enough monies to pay all creditors, and, had the case remained in Delaware the Lender's lien would have been found (most likely) to have primed the Producers' liens. The case being in Texas now provides a new forum for whether the *SemCrude* decision is correct. Second, with the case remaining in Texas, Debtor's board still retains control of the case, including the right to have the case remain in chapter 11. While the Court appreciates any debtor's desire to retain control of a corporate chapter 11, the Court cannot discern how the fees associated with the Delaware filing were necessary and reasonable for the benefit of the bankruptcy estate. Those services only benefitted Debtor's board and its officers. Accordingly, Applicant's request for fees is reduced by $28,708.50 for fees related to the Delaware filing and the Receivership.[9]

CONCLUSION

IT IS THEREFORE ORDERED that the First and Final Application of Armory Strategic Partners, LLC for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred from January 13, 2018 through April 7, 2018 (ECF No. 531) is GRANTED, IN PART and DENIED, IN PART.

IT IS FURTHER ORDERED that to the extent that any of Debtor's cash is cash collateral, Debtor must pay Applicant first using cash that is not cash collateral.

---

[9] The Court acknowledges that some efforts expended prior to the filing in Delaware would have been expended regardless of whether the case was filed in Delaware of the Western District of Texas and excluded such efforts from its reduction. The Court determined this amount based on the detail provided in Applicant's time records. The Court also acknowledges that it approved employment for Debtor's local Delaware counsel (Chipman Brown Cicero & Cole, LLP) (ECF No. 188) and their accompanying fees associated with the Delaware filing (ECF No. 297). The Court notes that no Party objected to either matter. Moreover, at the time these matters were considered, there was no evidence before the Court to indicate that such employment and fees were not beneficial to the estate.

IT IS FURTHER ORDERED that Armory Strategic Partners, LLC is awarded fees on a final basis in the amount of $260,224.00 as CRO for Debtor in Possession from January 13, 2018 through April 7, 2018.

IT IS FURTHER ORDERED that Armory Strategic Partners, LLC shall be reimbursed for its expenses of $23,380.67.

IT IS FURTHER ORDERED that Armory Strategic Partners, LLC is authorized to apply the retainer of $60,000 to the allowed fees in the amount of $283,604.67.

IT IS FURTHER ORDERED that Debtor is authorized to pay Armory Strategic Partners, LLC the outstanding balance after application of the retainer in the amount of $223,604.67.

All other relief not specifically granted herein is DENIED.

### # #