

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: September 13, 2018.**

_____
**CRAIG A. GARGOTTA**
**UNITED STATES BANKRUPTCY JUDGE**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| | § | |
| IN RE: | § | CASE NO. 18-50085-CAG |
| | § | |
| FIRST RIVER ENERGY, LLC, | § | |
| | § | CHAPTER 11 |
| Debtor. | § | |

MEMORANDUM OPINION AND ORDER
GRANTING, IN PART AND DENYING, IN PART FIRST INTERIM APPLICATION OF
AKERMAN LLP COUNSEL TO DEBTOR FOR ALLOWANCE OF COMPENSATION
FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED
FROM <u>JANUARY 12, 2018 THROUGH APRIL 30, 2018 (ECF NO. 563)</u>

Came on to be considered Akerman LLP's ("Akerman" or "Applicant"), counsel to the

Debtor and debtor-in-possession (the "Debtor" or "First River") in the above-captioned chapter 11

case, First Interim Fee Application for Allowance of Compensation for Services Rendered and

Reimbursement for Expenses Incurred from January 12, 2018, through April 30, 2018 (the "Application"). Akerman requests approval of the for (i) the allowance of compensation in the amount of $739,779.50 for professional services performed by Akerman and expenses in the amount of $35,390.96 for the period January 12, 2018 through April 30, 2018 (the "Application Period"), (ii) the authorization for Akerman to apply the retainer of $287,562.19 to the unpaid balance; and (iii) the authorization for the Debtor to pay Akerman the remaining balance of $487,608.27. For the reasons stated herein, the Court finds that the Application is allowed, in part, and denied, in part.

### JURISDICTION AND VENUE

The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1334. This matter is defined as a core proceeding under 28 U.S.C. § 157(b)(2)(A) (administration of the estate) and 28 U.S.C. § 157(b)(2)(B) (allowance or disallowance of claims against the estate). Venue is proper under 28 U.S.C. §§ 1408 and 1409. This is a contested matter under Fed. R. Bankr. P. 7052, in which the Court may make findings of fact and conclusions of law. This matter is referred to the Court under the District Court's Order of Reference.

### BACKGROUND

First River was formed in 2014 to provide "midstream" transportation services to the oil industry across the southwestern United States and Great Plains. As a midstream service business, Debtor specialized in the purchasing and marketing of crude oil and condensate, along with all necessary multi-modal logistics throughout the journey from source to refinery. First River's services included buying and selling domestic crude oil and transporting oil through a combination of trucks or pipeline. Debtor generated substantially all its revenue through fee-based production agreements (the "Production Agreement"). In the case of a typical Production Agreement, Debtor

utilized company trucking assets or contracted with a third-party carrier to deliver to a third party (the "Customer") an agreed-upon volume of oil. Debtor would purchase crude oil directly from an upstream producer at a lease and ship the oil via transporting by truck and/or pipeline.

On January 12, 2018, (the "Petition Date"), Debtor filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code in the Delaware Bankruptcy Court, initiating Bankruptcy No. 18-10080. Also on January 12, 2018, two producers, U.S. Energy Development Corporation ("USED") and Viceroy Petroleum, LP. ("Viceroy") initiated a state court lawsuit against Debtor in the 408th Judicial District Court of Bexar County, Texas (the "State Court"), styled *U.S. Energy Development Corporation and Viceroy Petroleum, LP., Plaintiffs v. First River Energy, LLC, Defendant*, Cause No. 2018-CI-00648 (the "Receivership Action"), claiming breach of contract and seeking the emergency appointment of a receiver over Debtor. The State Court then appointed Ray Battaglia as the receiver (the "Receiver") shortly after the filing of the lawsuit. On January 12, 2018, the Receiver filed a chapter 11 petition in this Court. (Bankruptcy No. 18-50063). The State Court lawsuit was removed to this Court on January 12, 2018. (Adv. Proc. 18-05005, ECF No. 1).[1]

On January 19, 2018, various producers filed an Amended Motion to Appoint Chapter 11 Trustee in Bankruptcy No. 18-50063. (ECF No. 5). Defendant/Debtor filed a Motion to Vacate Receivership (ECF No. 13 in the 18-05005 Adversary Proceeding) and a Motion to Dismiss Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1), (b)(2), (b)(5) and (b)(6) (Adv. Proc. 18-5005, ECF No. 12). On January 17, 2018, USED and Viceroy filed a motion to dismiss the Delaware bankruptcy case (the "Motion to Dismiss Case") (ECF No. 31). As a result of these filings, Debtor had two chapter 11 cases pending at the same time; one in Delaware and one in

---

[1] "ECF No." indicates the electronic document number on the Court's docket.

Texas. The Delaware Bankruptcy Court *sua sponte* transferred the Delaware bankruptcy case to this Court. (Bankr. Case No. 18-50085, ECF No. 40). As such, this Court would have had to decide which bankruptcy case would go forward.

Debtor, Receiver, and the various producers reached a compromise and agreed inter alia that Adversary Proceeding No. 18-05005 would be dismissed; the Receiver would relinquish his role as the receiver for Debtor; and the Motion to Appoint Trustee and Motion to Dismiss Case would be withdrawn. Further, the Receiver supported Debtor's Motion to Dismiss Bankruptcy Case (Case No. 18-50063, ECF No. 20) and independently requested that the Court dismiss Bankruptcy Case No. 18-50063. On February 2, 2018, the Court dismissed Bankruptcy Case No. 18-50063 (ECF No. 30).

Once it was determined which case would go forward, Akerman and other professionals assisted Debtor in obtaining cash collateral orders including a final order; preparing Schedules with approximately 20,000 creditors and the Statement of Financial Affairs; obtaining approval for a process to establish § 503(b)(9) claims; obtaining Court approval to pay Deutsche Bank Trust Company Americas as the Agent for the Lenders (the "Lenders") thereby eliminating approximately $130,000 per month in interest charges; obtaining approval to pay severance taxes (including the negotiation of a waiver of significant penalties and interest of approximately $322,000), and attending hearings and the Section 341 meeting. In addition, Debtor reduced its workforce to reduce employee compensation; completed the January reconciliation of December oil purchases and sales which resulted in collection of $26,700,000 in accounts receivable; rejected executory contracts; sold its rolling stock and various other assets; and in general wound up its business and liquidated its assets. Further, Debtor filed its Disclosure Statement for the Debtor's Plan of Liquidation under Chapter 11 of the United States Bankruptcy Code (the "Disclosure

Statement") (ECF No. 319) and Plan of Liquidation under Chapter 11 of the United States Bankruptcy Code (the "Plan"). (ECF No. 320). The Court has not conducted a hearing on the Disclosure Statement or the Plan.

### OBJECTIONS TO AKERMAN'S FEE APPLICATION

At the hearing on Akerman's Application, none of the objecting parties challenged Akerman's competency, but did object to its hourly rates arguing that Akerman's hourly fee was in excess of what local counsel would have charged for the same services. As such, there were objections to Debtor's retention of Dallas bankruptcy counsel. Two parties in interest objected to Akerman's fee application: the United States Trustee and the Producers.

A.    Producers'[2] Objections (ECF Nos. 563 and 605)

The Producers argue that two decisions made prior to Debtor's bankruptcy filing run counter to the agreed ultimate goal of the case (i.e., the orderly liquidation of Debtor's and the distribution of assets to creditors in accordance with their priorities). The first was to follow the directive of the Lenders that Debtor file its case in Delaware. The second was, through the cash collateral order process, to grant the Lenders extraordinary protection and influence over the administration of the case.

The Producers argue that the Debtor's decision to file in Delaware resulted in enormous direct and consequential expense to the estate and its creditors including: (1) the expense of local counsel to make the Delaware filing; (2) additional expense to principal bankruptcy counsel, Akerman, in traveling and appearance in the venue; and (3) the initiation by certain of the Producers of the receivership action and the filing of a competing chapter 11 case in San Antonio.

---

[2] There are a number of Producers in this case that supplied crude oil and condensate to Debtor. Although there are several counsel representing different groups of Producers in this case, their interests are aligned. As such, the term "Producers" indicates the collective Producers' interests in this case.

Further, the Producers maintain that there appears to have been a substantial duplication of effort associated with the property sales.

The Producers acknowledge that there are instances in which entries in the Akerman application are not, in and of themselves, unreasonable but when considered together with expenses in other applications (i.e., that of Armory Strategic Partners or that of local Delaware counsel) are cumulatively excessive. Further, the Producers complain that the professionals in this case, purportedly with national practices, seek reimbursement for the costs of travel as well as compensation for their travel time (albeit at reduced hourly rates). Producers argue that Akerman has a San Antonio office. Therefore, the bankruptcy estate should not bear travel costs (including professional "downtime") of Debtor's counsel in adequately staffing a case.

The Producers argue that the Court should reduce the award to Akerman of fees and expenses associated with the disposition of assets. The Producers note that Armory Strategic Partners ("Armory") seeks compensation of slightly more than $140,000.00 for professional time for asset sales. Akerman requests compensation of slightly more than $50,000.00 for professional time for asset sales. The Producers argue that it is not reasonable for the estate to bear the costs of nearly $200,000 for the sale of assets which, in the end, benefits principally the Lenders rather than the bankruptcy estate.

In addition, the Producers argue that the Court should reduce the award to Akerman of fees and expenses associated with fee applications and professional employment. Akerman seeks fees not only for its own purposes but also in support of the employment and fee applications of Armory and local Delaware counsel (Chipman Brown Cicero & Cole, LLP). Akerman requests compensation related to employment and fee applications in the amount of $67,878.00. In its own application, Armory requests more than $25,000.00 in compensation for matters related to

employment and compensation. The Producers argue that the total, which exceeds $92,000.00, is neither reasonable nor necessary.

The Producers assert that there are extraordinary costs associated with travel; not only the actual transportation costs but also the payment of professional fees (albeit at reduced amounts) for "nonworking" travel. Akerman seeks $38,842.50 for professional compensation, and $14,620.19 in transportation expenses (not including accommodation and meals). Akerman maintains an office in San Antonio. Akerman represents a debtor whose business operations, management and majority of creditors are in South Texas. The Producers argue that these costs are neither reasonable nor necessary.

B.     The United States Trustee Objections (ECF No. 606)

The United States Trustee (the "U.S. Trustee") also objected to Akerman's Application. In its Objection, the U.S. Trustee objects to the allowance of Akerman's fees on a categorical basis. In summary, the U.S. Trustee argues that:

This case is a liquidating case. Debtor ceased regular operations before filing this bankruptcy case. The primary issue in this case, which will be resolved through adversary proceeding 18-05015, is whether the asserted liens of various producers have priority over the asserted liens of the Lenders. Depending on the resolution of that dispute, Debtor, a trustee, or whatever entity may be formed in a plan of reorganization, will distribute Debtor's cash in conformity with the order of priority. The Trustee maintains that if this case were converted to chapter 7, a chapter 7 trustee might request a statutory commission of approximately $900,000 for distributing nearly $30 million in assets. Debtor urged keeping this case in chapter 11 on the

premise that a chapter 11 case would be less expensive and therefore leave more money for creditors. The U.S. Trustee disputes that contention.[3]

The U.S. Trustee notes that through the first 3 1/2 months of this liquidating case, the costs of running this case as a chapter 11 case have exceeded $2.3 million. Further, the costs of this chapter 11 case also include the pre-filing bonuses Debtor paid on the petition date to two employees of the Debtor, presumably to keep them working during a chapter 11 case. The U.S. Trustee contends that the evidence does not support a finding that the overall fees and expenses sought in this case are reasonable based on the facts of the case.

The U.S. Trustee argues that this case should have been relatively straightforward from Debtor's perspective. Debtor needed to collect all of its accounts receivable and sell its remaining assets. Applicant has charged $92,850.00 for Case Administration. In paragraphs 42–45 of the Application, Applicant describes its activities in this area as working with management to make sure management complied with the Bankruptcy Code, responding to U.S. Trustee and creditor inquiries, and filing a motion regarding publication notice. The U.S. Trustee argues that the description of the activities does not support $92,850.00 in fees for this category. Moreover, Akerman has not provided evidence that all the time spent in this category was reasonable and necessary.

In addition, the U.S. Trustee maintains that before approving any of its fees related to the Delaware work, Applicant must show that filing this liquidation case 1,700 miles from its headquarters was ever in the best interests of the estate. Without such a showing, the U.S. Trustee posits that the Court should not approve any fees or expenses related to going to Delaware or

---

[3] Notably, the Producers filed their Motion to Convert Case on February 23, 2018. (ECF No. 215). At the request of the Producers, that Motion has been continued several times. It should be noted that this Motion, along with other pending matters, was continued to allow for an unsuccessful mediation of all disputes in this case.

arguing against the motion to transfer venue to San Antonio. In that regard, Akerman charges $105,081.50 for work in the "Receiver/Removal" category. The U.S. Trustee notes that this work was to remove the receivership case to bankruptcy court and to have the chapter 11 bankruptcy case filed by the Receiver dismissed. The U.S. Trustee argues that Applicant needs to show why its efforts in this category brought any value to the estate. The U.S. Trustee believes that Debtor could have agreed to convert the case to chapter 7 or allowed the Receiver's case to remain and agreed to the appointment of a chapter 11 trustee. The U.S. Trustee maintains that conversion to chapter 7 or the appointment of a chapter 11 trustee would have saved the estate money. Moreover, Akerman seeks $109,682.50 for preparing the plan and disclosure statement. The U.S. Trustee questions the amount of fees for disclosure statement and plan preparation because this is a liquidating case where the distribution to creditors is dependent on whether the Lenders or the Producers win. If the Producers prevail, there could be the possibility that the estate will make no distributions to junior classes of claims.

The U.S. Trustee also questions charges $67,878.00 for Fee/Employment Applications and $35,390.96 in expenses, and $38,842.50 in non-working travel. The U.S. Trustee believes that the Court should only approve those expenses and fees that the Court determines were actual and necessary. By way of example, Applicant had four attorneys appear at the hearing on March 28, 2018. Counsel appears to have billed the estate that week for more than $4,000 for hotels. The U.S. Trustee suggests that if the Court determines that having four attorneys at the March 28, 2018 hearing was unnecessary and that, for example, two would have been sufficient, the Court should deny reimbursement for hotels, airfare, taxis, and meals for the attorneys it determines need not have appeared in person. Moreover, the same analysis applies to sending multiple counsel to Delaware and other hearings.

C.      Debtor's Response to the Producers' Objection (ECF No. 626)

In summary form, Debtor argues in response that:

As a Delaware limited liability company, Debtor had the right to seek bankruptcy relief in Delaware. Debtor was advised of its various venue options to seek bankruptcy relief and the Debtor's board in its business judgment authorized the Debtor to file in Delaware, a condition imposed by the Lenders in exchange for use of cash collateral.

The Producers further argue, but cite no authority for the proposition, that because Debtor sought and obtained Court approval of the use of cash collateral based on an agreement with the Lenders, Akerman's fees and expenses should be disallowed. Akerman claims that its fees and expenses are reasonable and were for actual, necessary services rendered and incurred amidst time-pressures early in the case as a result of unique issues in what has been designated a large complex case.

Further, Akerman argues that objections to fee applications must be specific. *In re Hutter Const. Co.*, 126 B.R. 1005, 1021 (Bankr. E.D. Wis. 1991)). "[T]hose challenging an attorney's fee application must articulate their objection with specificity, indicating particular entries that seem unreasonable, rather than expounding conclusory statements that applicant is seeking too much compensation." *In re Kelsey*, 272 B.R. 830, 834 (Bankr. D. Vt. 2002) (citing *In re S.T.N. Enters., Inc.*, 70 B.R. 823, 840 (Bankr. D. Vt. 1987)). Applicant maintains that the filing of a fee application, however, in a form complying with and containing the information required by applicable law creates a *prima facie* case for the reasonableness of the fees. *See, e.g. In re Blackwood Assocs., L.P.*, 165 B.R. 108, 111 (Bankr. E.D.N.Y. 1994) (finding that the fee application contained all of the information and detail necessary for a presumption of reasonableness and that a *prima facie* case for reasonableness had been made); *In re Hunt's*

*Health Care, Inc.*, 161 B.R. 971, 980 (Bankr. N.D. Ind. 1993) (concluding that a fee application containing the same type of descriptive detail and exhibiting the same type of billing judgment the applicant would give a valued client creates a presumption that the fee requested is reasonable).

Akerman also argues that there is no automatic denial of compensation for overlapping professional attention to a Chapter 11 debtor's problems, especially where it is necessary and reasonable for several professionals to work together: for example, coordination of services, delegation of responsibilities, development of strategies, and drafting of documents. *See **In re Microwave Prod. of Am., Inc.***, 102 B.R. 661, 665 (Bankr. W.D. Tenn. 1989); *see also **In re Aztec Co.***, 113 B.R. 414 (Bankr. M.D. Tenn. 1990). Further, Akerman argues that there is a distinction between Avila and Armory preparing inventories, generating interest in the sale items and conducting the auction; while Akerman prepared proposed bid procedures, drafted motions, argued sale procedures motion, obtained Court approval, and addressed numerous legal issues that arose during the sale process, including tax collector's concerns relating to the property being sold.

Akerman maintains that a staple of the United States judicial system is that there is no requirement in the Bankruptcy Code on the locale of Debtor's counsel or professionals in a bankruptcy case. Dallas law firms represent parties in San Antonio and throughout Texas. Akerman states that the Producers' complaint that Akerman should not be reimbursed for travel and because Akerman has a San Antonio office is meritless. The Producers are correct that Akerman has a San Antonio office, however Akerman currently does not have any lawyers in the San Antonio office whose practice focuses on bankruptcy, let alone complex chapter 11 cases such as this Case. Further, a debtor can choose which counsel it employs.

## EVIDENCE AT HEARING ON AKERMAN FEE APPLICATION

<u>Debra Kryak</u> – Debra Kryak ("Kryak") has served as the Debtor's CEO since April 2016. Kryak testified as to her extensive experience in the oil and gas industry. She is currently Debtor's only employee. As Debtor's CEO, she has streamlined operations, including eliminating ticketing for purchases of crude oil and condensate and serving also as the accounts payable manager. Kryak additionally serves as CFO of Debtor while Scott Avila of Amory serves as the CRO.[4] Kryak explained that Avila serves as Debtor's second officer and is responsible for financial and income analysis, in addition to assisting in the preparation of financial information for Debtor's bankruptcy case. Further, Kryak explained that Avila's services were necessary because, given the limited number of employees when Debtor filed bankruptcy, neither she nor anyone on her staff could provide the financial reporting that a chapter 11 bankruptcy case requires. Moreover, Kryak stated that she relied on Akerman for legal counsel and Avila for financial assistance. In summary form, Kryak stated that she believed that Armory and Akerman's fees are reasonable and necessary.

Kryak was pressed to explain why she received a retention bonus equal to her annual salary of $264,000.00 plus her annual salary as a condition of remaining Debtor's CEO and CFO. Kryak stated that she did not make her retention as Debtor's CEO and CFO conditioned on receiving any additional compensation. She further stated that one other employee of Debtor was paid a retention bonus of $141,000 to finish the claims process with one of Debtor's purchasers.[5] Kryak stated that she did not recall any discussion that Debtor's board considered converting the case to chapter 7 after all Debtor's accounts receivables were liquidated. Kryak acknowledged that once Debtor filed chapter 11, there was no chance Debtor could operate as a going concern. Further, in

---

[4] Amory, and specifically Scott Avila, was retained to serve as Debtor's Chief Restructuring Officer ("CRO").

[5] The Producers, United States Trustee, and the Court were not aware of the payments to Debtor's insiders on the petition date or that other employees had been paid bonuses to continue to work for Debtor.

reviewing some of Armory's financial analysis prior to filing chapter 11, she was aware that a liquidating chapter 11 plan would most likely not be able to pay all of the Producers' claims if the Producers' lien was determined to have first priority.

David Parham – David Parham ("Parham") testified as lead counsel in Debtor's chapter 11 case. Parham, along with John Mitchell, are lead counsel to Debtor and partners at Akerman. Parham has over twenty years of bankruptcy experience and has handled a number of large bankruptcy cases in San Antonio. Parham explained that Debtor's board elected to file bankruptcy in Delaware. Further, the board believed that filing in Delaware could maximize value for creditors. Parham noted that the bankruptcy case in Delaware remained there for a short period of time.

Parham stated that there was no duplication of services with Armory. He explained that it is customary for bankruptcy counsel to confer with other professionals of the estate. Moreover, Akerman relied on Armory to prepare the financial data necessary to prepare a number of pleadings for filing in bankruptcy court. Parham disagreed that the bankruptcy filing in Delaware was not reasonable and necessary, noting that it was Debtor who elected to file in Delaware, not its bankruptcy counsel. Moreover, the board did not want to give control of the bankruptcy case to the Receiver. Parham acknowledged that the Delaware filing was done with the Lender's consent to facilitate an agreement on the use of cash collateral.[6] He noted that the board did not want to convert the case to chapter 7. Parham stated that a chapter 7 trustee could not have made the recoveries that this chapter 11 Debtor had.

---

[6] The Producers argue that the real purpose in filing in Delaware was to take advantage of the Third Circuit's decision in *Arrow Oil & Gas, Inc. v. J. Aron & Co. (In re SemCrude L.P.)*, 864 F.3d 280 (3d Cir. 2017), where in a similar dispute between a lender and producer, the lender prevailed on a priority of lien dispute.

Parham explained that the fees associated with the preparation of the Disclosure Statement and Plan (roughly $109,000) are reasonable given that they were filed within two months of the petition date and that those services included multiple term sheets and drafts, plus the consideration of the treatment and payment of § 503(b)(9) administrative claims. Moreover, in Parham's judgment, Akerman's overall services have been successful given the short timeline of the case and that Akerman was able to negotiate savings on the accrual of the Lender group's interest accrual on the debt and reduction of payment of tax to the State of Texas.

## DISCUSSION[7]

Pursuant to 11 U.S.C. § 330(a)(1)[8], a professional employed by a debtor-in-possession may be awarded: (a) reasonable compensation for actual and necessary services performed by the professional; and (b) reimbursement for actual, necessary expenses. (West 2018). The court may, on its own motion or the motion of the trustee, award compensation that is less than the amount of compensation that is requested. *Id.* at § 330(a)(2). Section 330 further precludes courts from awarding compensation for "unnecessary duplication of services; or services that were not reasonably likely to benefit the debtor's estate; or necessary to the administration of the case." *Id.* at § 330(a)(4)(A).

In accordance with Fifth Circuit case law, bankruptcy courts employ the lodestar method to calculate reasonable fees under § 330(a). ***In re Cahill***, 428 F.3d 536, 539–40 (5th Cir. 2005). The lodestar is computed by multiplying the number of hours an attorney would reasonably spend for the same type of work by the prevailing hourly rate in the community. *Id*. at 540. The court then considers whether the lodestar figure should be adjusted upward or downward depending on

---

[7] The discussion of § 330 and the Fifth Circuit's analysis of fee awards in chapter 11 cases is reproduced from the Court's opinion in ***In re Palmaz Scientific, Inc.***, 556 B.R. 770, 783-85 (Bankr. W.D. Tex. 2016).
[8] Unless otherwise indicated, all references are to 11 U.S.C. *et seq*.

the circumstances of the case, looking specifically to the *Johnson* factors. ***Johnson v. Ga. Highway Express, Inc.***, 488 F.2d 714, 717–19 (5th Cir.1974). The **Johnson** factors include the following: (1) time and labor required; (2) novelty and difficulty of the legal questions; (3) skill required to properly perform the legal services; (4) preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the clients or the circumstances; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. ***In re MSB Energy, Inc.***, 450 B.R. 659, 662 n.7 (Bankr. S.D. Tex. 2011) (citing *Johnson*, 488 F.2d at 717–19).

In its en banc decision in ***Barron & Newburger, P.C., v. Tex. Skyline (In re Woerner)***, 783 F.3d 266 (5th Cir. 2015), the Fifth Circuit Court of Appeals analyzed the statutory framework of chapter 11 cases regarding the retention of professionals for the debtor. In doing so, the court recognized that a chapter 11 debtor may retain counsel and hire professionals for the estate. ***Id.*** at 271. The court observed that Congress enacted a uniform scheme for retaining and hiring professionals and attorneys under §§ 327–330. ***Id***. at 271–72. Under § 330(a)(1), an attorney whose employment was approved under § 327 may request "reasonable compensation for actual, necessary services rendered." ***Id***. Moreover, the bankruptcy court may use its discretion in awarding compensation less than the amount requested. ***Id***. Section 330(a)(3) directs courts to "consider the nature, the extent, and the value of the legal services provided when determining the amount of the reasonable compensation to award, taking into consideration a number of factors listed in § 330(a)(3)." ***Id.*** Further, under § 330(a)(4), a court may not allow compensation for "services . . . not reasonably likely to benefit the debtor's estate[.]" 11 U.S.C. § 330(a)(4)(A)(ii)(I).

The Fifth Circuit explained that § 330 "states twice, in both positive and negative terms, that professional services are compensable only if they are likely to benefit the debtor's estate or are necessary to case administration." *Id.* at 273. Stated differently, a court may approve compensation of an attorney for services that are "reasonably likely to benefit" the estate and determine the reasonableness "at the time in which the service was rendered." *Id.* The court also recognized that litigation is a gamble and that § 330 permits a court to compensate an attorney not only for services that were necessary, but also for good gambles for services that were objectively reasonable at the time they were performed. *Id.* at 274. As such, the court concluded that the "actual benefit" test should be replaced by a prospective standard, following the holdings in the Second, Third, and Ninth Circuits.[9]

In reaching its decision, the Court notes that it has carefully reviewed the admitted evidence and weighed the credibility of each witness. The Court has also examined its docket in these cases and all relevant pleadings in connection with its consideration of the Akerman Application. The Court can make several initial findings that apply to its consideration of Akerman's Application. To begin with, notwithstanding the objecting parties' complaints about the amount of Akerman's fees, no one complained about the experience and competency of Akerman. As such, the Court will not reduce Akerman's fees on the basis of those factors. The objecting parties couched their objections into certain categories of fees and made an overall objection to the amount of Akerman's fees. Further, the objecting parties complain of duplication of services with Armory

---

[9] *In re Ames Dept. Stores, Inc.*, 76 F.3d 66, 71 (2d Cir.1996); *abrogated by* **Lamie v. U.S. Trustee**, 540 U.S. 526 (2003) (finding that a fee award should be contingent on reasonably likely to benefit the estate standard); *In re Top Grade Sausage, Inc.*, 227 F.3d 123, 131–32 (3d Cir. 2000) (rejecting a standard under § 330 that required a hindsight evaluation); *In re Smith*, 317 F.3d 918, 926–27 (9th Cir. 2002) (§ 330(a)(4)(A) requires a prospective approach in fee awards).

and the use of counsel outside of San Antonio, Texas that had a local office. Finally, the objecting parties question Debtor's decision to file in Delaware.

As an initial matter, the Court will not dictate to this Debtor or any other debtor who the debtor may employ as counsel. The fact that Debtor employed Dallas counsel is of no consequence in this case. The Court recognizes that employing Dallas bankruptcy counsel results in a higher hourly rate. There is no prohibition in the Bankruptcy Code and Rules that precludes a debtor from who it selects as counsel. While the Court agrees with the objecting parties that the amount of fees always factors into the rubric of "reasonable and necessary", the location of counsel does not. Further, there is nothing in the Bankruptcy Code and Rules that necessarily dictates where a debtor may file.

In corporate chapter 11 cases, the filing venue is always a consideration where counsel must evaluate tactically the best venue for its client to have its bankruptcy case adjudicated. Moreover, under the current structure of the venue provisions in 28 U.S.C. §§ 1408 and 1409, a corporate debtor's venue decision in filing a chapter 11 petition is a function of several factors. The Court recognizes the ongoing debate regarding whether the venue provisions under current law enable a manipulation to file in a particular district. There is no manipulation present in this case. Debtor was incorporated under the laws of Delaware. Moreover, the Delaware bankruptcy court expeditiously considered and transferred venue to this Court. As such, the Court will not make a finding that the filing in Delaware was not permitted.

The Court, having concluded that the filing of a bankruptcy case first in Delaware was not impermissible, must still determine under § 330(a) if the fees associated with the filing in Delaware are reasonable and necessary. The evidence shows that filing the case in Delaware was to preserve Debtor's board control of the case and to have a forum where the issue of the ***SemCrude*** decision

could be litigated. The facts of the case are the same whether filed in Delaware or Texas: Debtor does not have enough monies to pay all creditors, and, had the case remained in Delaware, the Lender's lien would have been found (most likely) to have primed the Producers' liens. The case being in Texas now provides a new forum for whether the *SemCrude* decision is correct. Second, with the case remaining in Texas, Debtor's board still retains control of the case, including the right to have the case remain in chapter 11. While the Court appreciates any debtor's desire to retain control of a corporate chapter 11, the Court cannot discern how the fees associated with the Delaware filing were necessary and reasonable for the benefit of the bankruptcy estate. Those services only benefitted Debtor's board and its officers.

In addition, Debtor's assertion that the case needed to be filed in Delaware to secure permission to use the Lenders' cash collateral is unavailing. Under the Lenders' argument, the bank group has a first lien that appears to be over secured. Therefore, assuming the Lenders would not have consented to the use of cash collateral, the Court still had the ability to determine Debtor's entitlement to use of cash collateral based on the fact that the Lenders are adequately protected. Notably, the Delaware bankruptcy court *sua sponte* transferred the case to this Court, finding that there was no reason for the case to remain there. The Delaware bankruptcy court noted that Debtor's assets, remaining employees, and the creditor body were all located in Texas. While the Court appreciates the tactical considerations in this case, those considerations do not support the payment of fees for filing the case in Delaware and contesting the Receiver's filing in Texas. As such, the fees in the Receivership/Removal category are disallowed in the amount of $105,081.50.[10]

---

[10] The Court also acknowledges that it approved employment for Debtor's local Delaware counsel (Chipman Brown Cicero & Cole, LLP) (ECF No. 188) and their accompanying fees associated with the Delaware filing (ECF No. 297). The Court notes that no Party objected to either matter. Moreover, at the time these matters were considered, there was no evidence before the Court to indicate that such employment and fees were not beneficial to the estate.

Both the Producers and the U.S. Trustee argue that counsel's fees for the preparation of a disclosure statement and plan of roughly $109,000 is excessive. This does not include time for further negotiations or attending related hearings. The Court has examined the hours charged in this category. The total hours charged for this category is 211 hours, which includes time for four partners and two associates. The Court has reviewed the Disclosure Statement and Plan and notes that both documents are competently drafted and include the usual disclosures, releases, and exculpation provisions a court would find in documents for this size of a case. There is a discussion of having a liquidation trust to deal with plan distributions and reservation of causes of action, but no such document is included. There are seven classes of claims. There does not appear to be any novel issues raised in the plan or disclosure statement because this case hinges on the Court's interpretation of the Third Circuit's opinion in *SemCrude, L.P.*

This Court has reviewed Akerman's time entries and notes most of the negotiations involve the Lenders, with less time charged dealing with the Producers and other creditors. While the Court believes the time entries to be accurate, there appears to be a duplication of effort by counsel, not including the time charged by Amory for its work on the Disclosure Statement and Plan. While the Court is reluctant to reduce counsel's fees for work performed, the Court cannot discern why it took the equivalent of five 40 hour work weeks to draft the Disclosure Statement and Plan . Further, the Court questions why four bankruptcy partners worked on the same documents, particularly where a number of the provisions in both documents are fairly standard in chapter 11 cases. The Court is mindful that the Disclosure Statement and Plan were filed roughly two months after the petition date, but this does not excuse the amount of hours charged. As such, the Court finds that not all the fees requested of $109,682.50 are reasonable and necessary, and reduces the fees allowed in this category by $34,682.50 to $75,000.00.

Both the Producers and the U.S. Trustee objected to the amount of Akerman's fees for preparation of the estate's professional's fees applications in the amount of $67,878.00. This Court has previously held that a metric for fee application preparation fees should be in the range of 3–5% of the fees requested. *See* **In re Palmaz Scientific, Inc.**, 556 B.R. at 787; *see also* **In re Mesa Air Grp.**, 449 B.R. 441, 445 (Bankr. S.D.N.Y. 2011) (finding that a 3–5% cap on fee preparation fees is a useful metric in determining the reasonableness of the fees and benefit to the estate). Notwithstanding that this case is designated as a "complex" case, it is a liquidating plan with the primary determination being the distribution of cash, subject to a lien priority dispute between the Producers and Lenders. As discussed herein, the amount of the fees charged should bear some reasonable basis to the scope of the case and the distributions to creditors. Accordingly, the Court finds that fee preparation fees are capped at 5% of the requested fees of $739,779.50, or $36,988.95, resulting in a reduction of $30,889.05 for fee application preparation fees.

The objecting parties contend that Dallas bankruptcy counsel and the associated costs of employing multiple attorneys (including expenses for coming to San Antonio) were not reasonable and necessary. The Producers and U.S. Trustee maintain that Akerman's legal services should be considered against what Armory seeks for fees in this case. The purpose of § 330 is to provide fair and reasonable compensation. "[I]n order to not deter competent counsel from entering the bankruptcy area, attorneys should receive in bankruptcy matters what they would receive on the open market." **In re Hunt's Health Care, Inc.**, 161 B.R. 971, 975 (Bankr. N.D. ID. 1993). "The amount of the estate, the complexity of the bankrupt's affairs, then time reasonably devoted to the service, the standing and experience of counsel . . . are all proper to elements to be considered in estimating the reasonableness of attorney's fees . . . ." **In re Christianson**, 175 F. 867, 868–69 (D. N.D. 1910). Nevertheless, "[i]t would be unwise both for creditors and bankrupts to make the

compensation so parsimonious that attorneys of standing and experience would be reluctant to act on behalf of bankrupts." *Id*. Thus, determining the approval of a fee application or amount of reasonable compensation based solely on the fact that multiple fee applications have been submitted is contradictory to the purpose of § 330, as it will likely deter competent attorneys from taking cases where the hiring of multiple professionals is necessary to administer the estate. The deterrence, however, can likely be mitigated if the submittal of multiple fee applications is considered along with the benefit of the services to the estate and the size of the estate. The Court has considered both the Akerman and Armory fee applications and cannot find that they were duplicative of services to Debtor. The Court has examined the orders approving the retention of both professionals and finds that while the fees in some instances are not reasonable and necessary, the fees and services are not duplicative.

The Court will not discount the hourly rate for Akerman's fees for professional services dedicated to legal services only. Further, the Court will not deduct fees for travel at one-half hourly rate time simply because Akerman counsel had to travel to hearings with more than one attorney. The Court will not penalize Debtor for using Dallas counsel because Akerman does not have local bankruptcy counsel. As noted herein, the Bankruptcy Code and Rules do not limit a debtor's choice of where its counsel may reside. The Court will, however, deduct travel and expenses in connection with the Delaware filing. The Court has examined Akerman's expenses in the total amount of $35,390.36. Notwithstanding the objecting parties arguments that the expenses claimed are inordinately high and unnecessary, the Court could only find one meal entry and travel associated with the initial hearings in Delaware that totaled $3,143.86 that the Court believes are not compensable. The Court is not going to deduct for more than one attorney appearing on behalf of

the Debtor because for the most part only 1 to 2 attorneys have appeared on any matters in this case.

## CONCLUSION

IT IS THEREFORE ORDERED that the Akerman LLP's First Interim Fee Application for Allowance of Compensation for Services Rendered and Reimbursement for Expenses Incurred from January 12, 2018 through April 30, 2018 is GRANTED, IN PART and DENIED, IN PART.

IT IS FURTHER ORDERED that Akerman LLP is awarded fees in the amount of $569,126.45 as counsel for Debtor in Possession from January 12, 2018 through April 30, 2018.

IT IS FURTHER ORDERED that Akerman LLP shall be reimbursed for its expenses of $35,390.96.

IT IS FURTHER ORDERED that Akerman LLP is authorized to apply the retainer of $287,562.19 to the allowed fees in the amount of $604,517.41 and Debtor is authorized to pay Akerman LLP he resulting balance of $316,955.22.

All other relief not specifically granted herein is DENIED.

# # #